IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-03409-PAB-CBS

ALAN FITZPATRICK,

    Plaintiff,

v.

NEWMONT MINING CORPORATION, a Delaware corporation,

    Defendant.

_____

**ORDER**
_____

This matter is before the Court on the Motion for Summary Judgment [Docket No. 24] filed by defendant Newmont Mining Corporation ("Newmont"). This Court has subject matter jurisdiction over plaintiff Alan Fitzpatrick's Age Discrimination in Employment Act ("ADEA") claim pursuant to 28 U.S.C. § 1331 and over Mr. Fitzpatrick's promissory estoppel claim pursuant to § 1367.

## I. BACKGROUND[1]

Mr. Fitzpatrick was born in 1949. From 1995 to 2006, Mr. Fitzpatrick worked for Newmont as a project director, responsible for overseeing major mining projects. Docket No. 24 at 3, ¶ 1. Pursuant to the Newmont Pension Plan, Newmont employees are entitled to receive an immediate pension when they reach the age of 55 and have 10 years of service with the company. Docket No. 24 at 4, ¶ 4. As a result, in June 2006, Mr. Fitzpatrick retired from Newmont and began consulting for various mining

---

[1]The following facts are undisputed unless otherwise indicated.

companies.  Docket No. 30-1 at 1, ¶ 2.

In late 2009, Mr. Fitzpatrick began working for Newmont on a three-month consulting contract.  Docket No. 24 at 3, ¶ 2.  Guy Lansdown, Newmont's Executive Vice President Discovery and Development, asked Mr. Fitzpatrick if he would consider returning to Newmont as a Vice President for a period of three to four years, or until Newmont recruited a replacement.  *Id.* at 3, ¶ 2; Docket No. 30-1 at 1, ¶ 3.  Mr. Fitzpatrick and Newmont engaged in negotiations and, on March 5, 2010, Mr. Fitzpatrick accepted a written offer of employment (the "employment agreement") to assume the role of Vice President, Business Opportunity Delivery.  Docket No. 24 at 5, ¶¶ 7-8.  Mr. Fitzpatrick's base salary was $325,000 per year.  Docket No. 25-4 at 1.  Although Mr. Fitzpatrick's employment with Newmont was on an at-will basis, *id.* at 3, the employment agreement's cash bonuses were spread over a four-year period.  *Id.* at 2.  The employment agreement provided for an annual cash payment of $125,000 at each service anniversary and the opportunity to earn "an additional $500,000.00 over the 4 year period, based on the achievement of agreed upon key performance metrics."  Docket No. 25-4 at 1-2.  The employment agreement stated that Mr. Fitzpatrick was eligible for the Employee Performance Incentive Program ("EPIP").  *Id.* at 2.  The EPIP entitled Mr. Fitzpatrick to receive an annual award of restricted Newmont stock units ("RSUs") based upon corporate performance metrics.  *Id.* at 2; Docket No. 30 at 8, ¶ 11.

The Newmont Mining Corporation 2005 Stock Incentive Plan (the "stock plan") provided the general framework under which Newmont made equity awards to its

employees, including RSU awards to its executives.[2] Docket No. 24 at 6, ¶ 12; *see also* Docket No. 26-1. The stock plan granted Newmont's compensation committee (the "compensation committee") "full discretionary authority to grant, pursuant to the terms of the Plan, Awards to those individuals who are eligible to receive Awards under the Plan." Docket No. 26-1 at 6, ¶ (c). As a result, the terms and conditions of each annual RSU award were determined by the compensation committee and set forth in a Newmont Mining Corporation 2005 Stock Incentive Plan Restricted Stock Unit Agreement (the "RSU agreement"). Docket No. 24 at 6, ¶ 12; *id.* at 10, ¶ 24; *see, e.g.*, Docket No. 26-2. Pursuant to the RSU agreements' "Vesting Period," an RSU award would "vest," or be converted to Newmont common stock and provided to the executive, over a period of three years. *See, e.g.*, Docket No. 26-2 at 2.

The February 28, 2011 RSU agreement's (the "2011 RSU agreement") Vesting Period provided that 33% of the 2011 RSU award would vest on February 28, 2012, 33% of the 2011 RSU award would vest on February 28, 2013, and 34% of the 2011 RSU award would vest on February 28, 2014. Docket No. 26-2 at 2. However, if, as relevant here, an executive were to "retire[] under Newmont's Pension Plan entitling Executive to an immediate pension . . . , the Vesting Period shall terminate, and all RSU's not theretofore forfeited in accordance with this Agreement shall become fully vested and non forfeitable" upon retirement. *Id.*; *see also* Docket No. 42 at 5-6, ¶ e.

On or about February 28, 2011, Mr. Fitzpatrick executed a 2011 RSU agreement. Docket No. 42 at 5-6, ¶ e. Subject to the terms and conditions of the 2011

---

[2]Pursuant to the EPIP, RSU awards are only available to executive level employees. Docket No. 24 at 4, ¶ 6 n.3 (citing Docket No. 25-5 at 4).

RSU agreement, Mr. Fitzpatrick was awarded 3,197 RSUs. *Id.*

In 2011, the compensation committee began reviewing Newmont's executive compensation program. Docket No. 24 at 9, ¶ 20. Newmont's Fed. R. Civ. P. 30(b)(6) witness David Kristoff testified that Newmont wanted to better align the program with "good governance practices, meaning that [it was] aligned with business objectives as well as shareholder perspectives." Docket No. 30-3 at 27-28, pp. 125:22-126:3. As part of that review, the compensation committee retained independent compensation consultants Frederic Cook and Kathryn Neel from Frederic W. Cook & Co. to analyze executive compensation market practices and to review and recommend changes to Newmont's executive compensation program. Docket No. 24 at 8-9, ¶¶ 19-20; *see also* Docket No. 26-4 at 1-2, ¶ 3. According to Ms. Neel, good corporate governance practices in the executive compensation context "incentivize executives consistent with shareholder interests, such as the long-term success of the corporation." Docket No. 26-4 at 1-2, ¶ 3.

The purpose of RSU awards with a three-year vesting period is to retain the executive for three years after the award date. Docket No. 24 at 9, ¶ 21; *see also* Docket No. 26-4 at 2, ¶ 6 ("The purpose of multi-year vesting on restricted stock unit grants is to encourage the executive to remain employment for the vesting term."). Mr. Cook explained to the compensation committee that, in his opinion, "immediate vesting" or "accelerated vesting" of RSU awards at retirement, as the 2011 RSU agreement contemplated, runs counter to the RSU awards' goal of retaining executives. Docket No. 24 at 9, ¶ 20; *see also* Docket No. 26-4 at 2, ¶ 6 ("immediate vesting at retirement of restricted stock unit grants with a three year vesting schedule runs counter to the

retention goal of the grant and is not a good corporate governance practice"). Mr. Kristoff testified that "acceleration of vesting . . . is generally deemed . . . to be a negative governance practice, because . . . one you're providing compensation to somebody who hasn't earned it, and you're providing essentially shareholder dollars to somebody who's not providing those services." Docket No. 25-2 at 8, p. 126:10-19. Mr. Cook and Ms. Neel recommended that Newmont eliminate accelerated or immediate vesting on retirement in favor of either (1) continued vesting after one year, such that if an executive retired more than one year after receiving an award, the grant would fully vest upon retirement, or (2) pro rata vesting, such that shares would vest based on the total shares divided by the days elapsed between the date of the award and date of the retirement. Docket No. 24 at 9, ¶ 20 n.6; Docket No. 26-4 at 2, ¶ 6; *id.* at 4. A pro rata vesting policy incentivizes an executive to remain with the company in order avoid forfeiture of all unvested RSUs. Docket No. 24 at 10, ¶ 25.

The compensation committee reviewed Mr. Cook's and Ms. Neel's recommendations. Docket No. 24 at 9-10, ¶ 23. In addition, Mr. Kristoff surveyed the executive compensation programs of approximately 15 to 20 similar companies. Docket No. 25-2 at 12, p. 134:5-8; *see also* docket No. 27-1. Mr. Kristoff's survey indicated that the companies handled the vesting of shares at retirement in a variety of ways, including pro rata accelerated vesting, full acceleration vesting, continued vesting post-separation, or requiring the retiring employee to forfeit all unvested units. Docket No. 24 at 9-10, ¶ 23; *see also* Docket No. 27-1.[3]

---

[3] In July 2012, Mr. Kristoff received a survey on executive compensation from the Center of Executive Compensation, *see generally* Docket No. 27-2, which he requested

On February 21, 2012, the compensation committee approved changing future RSU agreements to vest RSUs on a pro rata basis upon an executive's retirement (the "pro rata vesting policy"). Docket No. 24 at 10, ¶ 24.[4] As a result, the March 2, 2012 RSU agreement (the "2012 RSU agreement") retained a similar three-year vesting period as prior agreements, but further stated that if an executive retired "under Newmont's Pension Plan entitling Executive to an immediate pension . . . the Vesting Period shall terminate for a pro-rata percentage of the shares granted, based upon the state of grant and separation date." Docket No. 26-3 at 2. Prior agreements, including the 2011 RSU agreement, remained unchanged. *Id.* at 10, ¶ 26.[5]

Mr. Kristoff testified that, "[p]rimarily, the basis for this decision centered around improving our overall governance practices, making sure that we were also putting plans into place that had terms that made sense for what we were trying to do, namely retention." Docket No. 30-3 at 27, p. 125:12-16; *see also* Docket No. 24 at 10, ¶ 25.

---

after the compensation committee decided to switch to a pro rata policy to serve as additional reference information. Docket No. 30-3 at 35-36, pp. 172:19-173:20. Newmont does not contend that the Center of Executive Compensation survey was a factor in the compensation committee's February 21, 2012 decision to adopt the pro rata vesting policy.

[4]To the extent Newmont's brief cites Mr. Kristoff's deposition testimony in support of its assertion that, on October 25, 2011, the compensation committee "approved the executive severance plan that provided for pro rata vesting on separation," Docket No. 24 at 9, ¶ 22, such an assertion is contradicted by Mr. Kristoff's deposition testimony and is therefore unsupported. *See* Docket No. 25-2 at 14, p. 139:10-16; Docket No. 30-3 at 26, p. 124:18-25.

[5]Although Mr. Fitzpatrick asserts that the compensation committee "approved the amended of the RSU portion of the Stock Plan," he provides no evidence that the stock plan itself was amended. Docket No. 30 at 12, ¶ 24. Rather, the compensation committee appears to have implemented the pro rata vesting policy by merely altering the terms of the 2012 RSU agreement. *See, e.g.*, Docket No. 26-3 at 2.

Although Newmont understood that the pro rata vesting policy would impact those executives who were retiring at the time the policy took effect, such an impact does not appear to have been a consideration or factor in the compensation committee's decision to adopt the pro rata vesting policy.  Docket No. 30 at 12-13, ¶ 25; *see also* Docket No. 30-3 at 27, p. 125:1-8; *id.* at 29, p. 127:1-10.  The compensation committee did not consider grandfathering in those executives who were retirement eligible at the time the pro rata policy was adopted.  Docket No. 30-3 at 25, p. 94:3-21.

In 2012, Mr. Fitzpatrick received an RSU award.  On or about March 2, 2012, he executed a 2012 RSU agreement granting him 3,974 RSUs pursuant to the 2012 agreement's terms.  Docket No. 30 at 10, ¶ 17.  On April 30, 2012, Mr. Fitzpatrick voluntarily resigned from Newmont.  Docket No. 42 at 6, ¶ i.  Upon resigning, Mr. Fitzpatrick received 2,132 vested shares pursuant to the 2011 RSU agreement and 221 vested shares pursuant to the 2012 RSU agreement.  Docket No. 24 at 11, ¶ 29.

Mr. Fitzpatrick contends that the pro rata vesting policy negatively impacted other Newmont employees.  Docket No. 30 at 14, ¶¶ 31-32.  Mr. Fitzpatrick asserts that plaintiff's Exhibit I [Docket No. 33-3] is "a spreadsheet listing employees who the change to the Stock Plain in 2012 affected" and shows that "approximately 160 employees over the age of 40 were affected."  Docket No. 30 at 14, ¶ 31.  Newmont argues that Mr. Fitzpatrick's assertions regarding Exhibit I are unsupported by citation to the record.  The Court agrees.  According to Mr. Kristoff, Exhibit I lists those employees who are stock-eligible by being "Grade 107" or above and who have an age plus service of 65 or more.  Docket No. 39-2 at 3, p. 180:12-16.  Mr. Kristoff was then asked: "Q. . . . So these would be people that, under the . . . older stock grant agreement, the 2011

and before, these would be the individuals at Newmont that, if they retired, they would receive an acceleration of their RSUs. Is that correct? A. No." *Id.* at 3, p. 180:17-22.[6] Mr. Fitzpatrick's assertion that each employee listed in Exhibit I was affected by the pro rata vesting policy is therefore unsupported.

Mr. Fitzpatrick asserts that plaintiff's Exhibit J [Docket No. 33-4] "identified those employees who would have been receiving accelerated RSUs prior to the revisions to the Stock Plan." Docket No. 30 at 14, ¶ 32. According to Mr. Kristoff, Exhibit J lists Newmont employees who retired and began collecting pension benefits in 2010 or after. Docket No. 30-3 at 39, p. 183:9-20. Each individual listed would have been entitled to accelerated vesting of RSU units at retirement for RSU awards granted before the 2012 RSU agreement. *Id.* at 39-40, pp. 183:21-184:3. Mr. Fitzpatrick asserts that plaintiff's Exhibit K identifies "employees who would have received accelerated vesting of RSUs prior to the revisions to the Stock Plan." Docket No. 30 at 14, ¶ 32. According to Mr. Kristoff, Exhibit K lists those employees who retired, but deferred receipt of their pension. Docket No. 30-3 at 41-42, pp. 185:1-186:8. Each individual listed would have been entitled to accelerated vesting of RSU units at retirement for RSU awards granted before the 2012 RSU agreement. *Id.* Mr. Fitzpatrick asserts that each of the employees listed in Exhibit J and Exhibit K is over

---

[6] Exhibit I lists several individuals who, although they have attained an age plus service level of 65 or greater, are under the age of 55. *See* Docket No. 33-3 at 1. According to Mr. Kristoff, individuals under the age of 55 may be eligible for a pension under the Newmont Pension Plan, but are not eligible to receive an immediate pension until reaching the age of 55. Docket No. 25-2 at 7, p. 100:4-25. As a result, pursuant to the 2011 RSU agreement, such employee would appear to be ineligible for immediate or accelerated vesting of RSUs upon retirement. *See* Docket No. 26-3 at 2.

the age of 40, an assertion which Newmont does not dispute. Docket No. 30 at 14, ¶ 32.[7]

On December 17, 2013, Mr. Fitzpatrick filed this case. Docket No. 1. On May 5, 2014, Mr. Fitzpatrick filed an amended complaint, asserting two claims against Newmont. Docket No. 22. Mr. Fitzpatrick brings an ADEA claim, alleging that the pro rata vesting policy creates a discriminatory disparate impact on older workers, and a state-law claim for promissory estoppel. *Id.* at 7-9. On October 17, 2014, Newmont filed the present motion, seeking summary judgment on both of Mr. Fitzpatrick's claims. Docket No. 24.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

---

[7]Although Newmont asserts that Exhibit J and Exhibit K include all pension eligible retirees, not just those retirees who actually received RSU awards, Mr. Kristoff's testimony is somewhat vague on this point and therefore must be construed in Mr. Fitzpatrick's favor. *See* Docket No. 30-3 at 39-40, pp. 183:21-184:14.

1997).

However, when "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

### III. ANALYSIS

#### A. ADEA Claim

The ADEA protects individuals at least 40 years of age, 29 U.S.C. § 631(a), from

discrimination with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "'[T]o establish a prima facie case of disparate impact age discrimination, plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group.'" *Apsley v. Boeing Co.*, 691 F.3d 1184, 1206 (10th Cir. 2012) (quoting *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1200 (10th Cir. 2006)). Unlike a traditional disparate treatment claim, disparate impact claims do not require proof of intentional discrimination. *Fulghum v. Embarq Corp.*, 778 F.3d 1147, 1168 (10th Cir. 2015). Once a plaintiff has established a prima facie case, an employer may avoid liability by establishing one of the ADEA's affirmative defenses. § 623(f); *see also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008). For purposes of resolving this motion, the Court assumes, without deciding, that Mr. Fitzpatrick has established a prima facie case.

Newmont argues that it is not liable for any disparate impact caused by the pro rata vesting policy because it adopted the policy based upon reasonable factors other than age. "It shall not be unlawful for an employer . . . to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section . . . where the differentiation is based on reasonable factors other than age . . . ." § 623(f)(1). This provision, commonly referred to as the "RFOA provision" is an affirmative defense, *Meacham*, 554 U.S. at 91, on which the employer bears the burden of persuading the factfinder that "its reasonableness 'defense is meritorious.'" *Fulghum*, 778 F.3d at 1169 (quoting *Meacham*, 554 U.S. at 101). "The focus of the defense is that the factor relied

upon was a 'reasonable' one for the employer to be using." *Meacham*, 554 U.S. at 96. The reasonableness of a particular factor is "categorically distinct from the factual condition 'because of age' and not necessarily correlated with it in any particular way: a reasonable factor may lean more heavily on older workers, as against younger ones, and an unreasonable factor might do just the opposite." *Id.*

It is undisputed that Newmont's rationale for adopting a pro rata vesting policy "was to improve corporate governance practices by ensuring that equity plans were consistent with the goal of executive retention." Docket No. 24 at 10, ¶ 25; *see also* Docket No. 25-2 at 8, p. 126:10-19. The question then becomes whether such a rationale was reasonable. The purpose of RSU awards with a three-year vesting schedule is to retain the executive for three years after the award date. Docket No. 24 at 9, ¶ 21. The pro rata vesting policy is designed to be more consistent with the purpose of retaining such executives. *Id.* at 10, ¶ 25; *see also* Docket No. 30-3 at 27, p. 125:12-16. According to Ms. Neel, pro rata vesting of unvested RSUs on retirement is a common practice among companies like Newmont.[8] Docket No. 26-4 at 2. Mr.

---

[8]Mr. Fitzpatrick characterizes the Center for Executive Compensation survey results as concluding that "only approximately 34% of the companies were following a pro rata basis for an award of stock units, while approximately 66% utilized another form of awarding stock units to its employees." Docket No. 30 at 13, ¶ 28. However, Mr. Fitzpatrick does not contend that these survey results render the pro rata vesting policy unreasonable and the Court finds no basis for so concluding. The Center for Executive Compensation surveyed 66 companies concerning, among other things, treatment of equity at retirement. Docket No. 27-2 at 2. The survey revealed that the companies surveyed "were almost evenly split between paying out on a pro-rata basis (34.8%) and allowing continuation of vesting beyond retirement (36.4%) with acceleration close behind (30.3%)." *Id.* These results do not, by themselves, suggest that Newmont's stated rationale for adopting a pro rata vesting policy was unreasonable.

Fitzpatrick does not contradict any of this evidence or directly argue that Newmont's stated rationale for adopting the pro rata vesting policy was unreasonable.

Mr. Fitzpatrick's only argument as to the RFOA defense is that "at no point did Newmont make any effort to determine the effect that that change would have on older employees, especially those employees who were planning to retire at or around the time the Stock Plan was changed." Docket No. 30 at 17. Newmont does not dispute that, in deciding to implement the pro rata vesting policy, it did not give any particular consideration to how the policy would impact executives such as Mr. Fitzpatrick who intended to retire at or around the time the policy was implemented. Docket No. 30 at 12-13, ¶ 25; *see also* Docket No. 30-3 at 27, p. 125:1-8. However, Mr. Fitzpatrick provides no authority suggesting that the RFOA provision requires an employer to consider the impact of the challenged practice on employees over 40 years of age or that the failure to do so renders a stated rationale unreasonable. To the contrary, Mr. Fitzpatrick's suggestion that Newmont could have used other means to achieve its goals while minimizing the impact on executives such as Mr. Fitzpatrick is irrelevant. *Cf. Smith v. City of Jackson, Miss.*, 544 U.S. 228, 243 (2005) ("Unlike the business necessity test [under Title VII's disparate-impact branch], which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the [RFOA] inquiry includes no such requirement."). The RFOA defense hinges on whether the factor the employer relied upon was reasonable, *see Meacham*, 554 U.S. at 96, and Mr. Fitzpatrick has failed to provide any evidence suggesting that Newmont's stated reason for adopting the pro rata vesting policy was unreasonable. *Cf. Fulghum*, 778 F.3d at 1169; *Pippin*, 440 F.3d at 1201 ("Indeed,

Pippin has cast no doubt on the reasonableness of these concerns at all.").

In the absence of any argument or evidence to the contrary, the Court finds that Newmont's stated rationale for adopting the pro rata vesting policy is a reasonable factor other than age. *See Pippin*, 440 F.3d at 1201 ("Corporate restructuring, performance-based evaluations, retention decisions based on needed skills, and recruiting concerns are all reasonable business considerations."). Mr. Fitzpatrick has failed to raise a genuine dispute of material fact with respect to the RFOA provision and, therefore, Newmont is entitled to summary judgment on his ADEA claim. *See Fulghum*, 778 F.3d at 1169 ("it is unnecessary to address [dispute over prima facie case] because summary judgment in favor of the ADEA Defendants was appropriate based on the RFOA defense").

### B.  Promissory Estoppel

Having dismissed Mr. Fitzpatrick's only claim arising under federal law, the Court next addresses the issue of whether it should exercise supplemental jurisdiction over his state-law promissory estoppel claim. While courts may exercise supplemental jurisdiction over state law claims if there is otherwise a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) states that a court may decline to exercise jurisdiction over such claims if "the district court has dismissed all claims over which it has original jurisdiction." When § 1367(c)(3) is implicated in the Tenth Circuit, courts are advised to dismiss pendent state law claims "'absent compelling reasons to the contrary.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (reversing the district court's grant of summary judgment on state

law claims); *Endris v. Sheridan Cnty. Police Dep't*, 415 F. App'x 34, 36 (10th Cir. 2011) ("any state-law claims for assault and battery or mental and emotional injury were inappropriate subjects for the exercise of pendent jurisdiction where all federal claims had been dismissed"). *But see Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 79 (10th Cir. 2011) (finding no abuse of discretion in trial court's decision to retain jurisdiction over state law claims after plaintiff voluntarily dismissed claims arising under federal law). Finding no compelling reason here to retain jurisdiction, the Court will dismiss Mr. Fitzpatrick's promissory estoppel claim without prejudice. *See* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced within the statute of limitations to be re-filed if involuntarily dismissed because of lack of jurisdiction); *Dalal v. Alliant Techsystems, Inc.*, 934 P.2d 830, 834 (Colo. App. 1996) (interpreting 28 U.S.C. § 1367(d) as tolling the statute of limitations while claim is pending in federal court); *see also City of Los Angeles v. Cnty. of Kern*, 328 P.3d 56, 65 (Cal. 2014) (noting that interpretations of § 1367(d) vary between jurisdictions).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Newmont's Motion for Summary Judgment [Docket No. 24] is **GRANTED** in part as indicated in this order. It is further

**ORDERED** that Mr. Fitzpatrick's ADEA claim is **DISMISSED** with prejudice. It is further

**ORDERED** that Mr. Fitzpatrick's state-law promissory estoppel claim is **DISMISSED** without prejudice. It is further

**ORDERED** that the trial preparation conference set for **Friday, April 17, 2015 at 3:30 p.m.** and the jury trial set for **Monday, May 4, 2015** are hereby **VACATED**. It is further

**ORDERED** that this case is dismissed in its entirety.

DATED April 17, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge